UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

ROBERT ALVERO,
Plaintiff,
v. Case No.:

CITY OF JACKSONVILLE, FLORIDA,
Defendant.
_____________________________________/

**COMPLAINT FOR VIOLATION OF THE FIRST AMENDMENT PURSUANT TO 42 U.S.C. § 1983, DECLARATORY AND INJUNCTIVE RELIEF, DAMAGES, AND DEMAND FOR JURY TRIAL**

Plaintiff Robert P. Alvero brings this action because the City of Jacksonville formally punished him as a firefighter for speech he made while off duty, outside the scope of his JFRD employment, and while serving as a sitting elected member of the Clay County School Board.

## INTRODUCTION

The First Amendment does not give government employers authority to punish public employees merely because their political or social speech becomes controversial, provokes criticism, or offends coworkers. Robert P. Alvero was off duty when he made the speech at issue. He spoke through his personal social-media account. He was not responding to an emergency, performing a JFRD assignment, speaking on behalf of JFRD, or carrying out any responsibility for which the City of Jacksonville employed him. At the same time, Alvero was a sitting elected member of the Clay County School Board participating in public discourse concerning race, culture, politics, social conditions, and nationally debated political commentary. The City nevertheless used its power as his

employer to punish the content of that speech. It issued a formal Written Reprimand, compelled race-related training, placed the discipline in his employment record, and warned him that future conduct could result in more severe punishment, including dismissal. And despite repeatedly invoking "disruption," the City identified no failed emergency response, no impaired rescue operation, no refusal by any firefighter to work with Alvero, no inability by Alvero to perform his duties, and no deterioration in his actual performance as a firefighter. What the City identified was offense, disagreement, concern, and speculation about what controversial speech might do to morale. Government cannot convert hostility toward protected expression into a constitutional justification for suppressing it merely by calling that hostility "disruption."

## PARTIES

1. Plaintiff Robert P. Alvero is a natural person and resident of the State of Florida.
2. At all times material, Plaintiff was employed as a firefighter by the Jacksonville Fire and Rescue Department ("JFRD").
3. Plaintiff's JFRD employee number is 79681.
4. At all times material, Plaintiff also served as a duly elected member of the Clay County School Board.
5. Plaintiff's elected position with the Clay County School Board is separate and independent from his employment with JFRD.
6. Defendant City of Jacksonville, Florida ("City") is a consolidated municipal government organized and existing under the laws of the State of Florida.

7. JFRD is a department and agency of Defendant City of Jacksonville.

8. At all times material, Defendant and its officials acted under color of state and local law.

## JURISDICTION AND VENUE

9. This action arises under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

10. This Court has original federal-question jurisdiction pursuant to 28 U.S.C. § 1331.

11. This Court also has jurisdiction pursuant to 28 U.S.C. § 1343(a)(3) and (4).

12. Plaintiff seeks declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

13. Venue is proper in the Middle District of Florida pursuant to 28 U.S.C. § 1391(b) because Defendant resides in this District and the events giving rise to this action occurred within this District.

14. Assignment to the Jacksonville Division is proper because the challenged governmental conduct occurred in Jacksonville and Duval County, Florida.

## FACTUAL ALLEGATIONS

### A. ALVERO SERVED THE PUBLIC IN TWO DISTINCT ROLES.

15. Plaintiff has served the public as a firefighter employed by JFRD.

16. Plaintiff simultaneously served the public in an entirely separate role as an elected member of the Clay County School Board.

17. Plaintiff's responsibilities as an elected School Board member were not among the duties he was employed by JFRD to perform.

18. Plaintiff's political views, public commentary, participation in civic debate, and speech concerning social and political issues likewise were not part of his ordinary responsibilities as a firefighter.
19. Plaintiff had no prior disciplinary history with JFRD before the events giving rise to this action.
20. Indeed, JFRD subsequently acknowledged Plaintiff's otherwise clean disciplinary record and excellent service to the Department.
21. Nothing in Plaintiff's employment history demonstrated an inability to perform his duties competently, professionally, or impartially.

**B. ALVERO SPOKE WHILE OFF DUTY AND OUTSIDE HIS JFRD RESPONSIBILITIES.**

22. In or about December 2025, Plaintiff published a video through his personal Facebook account.
23. Plaintiff made and published the speech while off duty from JFRD.
24. Plaintiff did not make the speech pursuant to any assignment, order, responsibility, or duty imposed upon him by JFRD.
25. Plaintiff was not responding to an emergency.
26. Plaintiff was not performing work at a fire station.
27. Plaintiff was not preparing an official JFRD report.
28. Plaintiff was not instructing or supervising firefighters.
29. Plaintiff was not addressing the public as a spokesperson for JFRD.
30. Plaintiff did not purport to communicate the official views or policies of the City of Jacksonville.

31. The speech therefore did not owe its existence to Plaintiff's professional responsibilities as a Jacksonville firefighter.
32. Instead, Plaintiff spoke publicly as a citizen while simultaneously serving as a sitting elected member of the Clay County School Board.
33. The video addressed Plaintiff's personal experiences, race relations, cultural differences, his experiences after immigrating to the United States, and nationally debated political commentary.
34. The speech did not concern an internal employment grievance against JFRD.
35. Plaintiff did not complain about his compensation.
36. Plaintiff did not seek a promotion.
37. Plaintiff did not complain about a supervisor.
38. Plaintiff did not demand different working conditions.
39. Plaintiff did not seek any employment benefit from the City.
40. The speech existed independently of Plaintiff's employment relationship with JFRD.

**C. THE CITY PUNISHED ALVERO FOR THE WORDS HE ACTUALLY SPOKE.**

41. The speech underlying this case is not hypothetical, unidentified, or disputed as to its basic content.
42. Defendant disciplined Plaintiff because of statements he made in the Facebook video.
43. Among the specific words spoken by Plaintiff and relied upon in the controversy were the following:

> "I have had 80 percent more negative experience with the African American community in this country than with white people. That being said, it doesn't mean that I haven't had good experiences with African American people.
>
> I have met a lot of great African American people, and I'm still friends with them because they are good decent people, but that's 20 percent of the people that I've met, African Americans.
>
> The other 80 percent, they've been nasty, they've been rude, they've been problematic—always trying to fight, disrespecting. So, why would I want to be around people like that. No."

44. The video also addressed nationally debated political commentator Nick Fuentes.
45. During that discussion, Plaintiff stated:

> "I know where Nick Fuentes is coming from."

46. Plaintiff does not allege that these words were universally accepted.
47. Plaintiff does not allege that every listener regarded them as appropriate.
48. Plaintiff does not ask this Court to endorse the substance of his views.
49. Plaintiff does not ask this Court to declare the statements wise, tactful, or immune from public criticism.
50. That is not the constitutional question.
51. The constitutional question is whether the City of Jacksonville, acting as Plaintiff's government employer, could formally punish Plaintiff for speech he made as an off-duty citizen outside the performance of his JFRD duties.

52. The controversial character of the speech does not answer that constitutional question in Defendant's favor.

53. To the contrary, the First Amendment's protection is particularly significant when expression is unpopular, offensive to some listeners, or the subject of heated public disagreement.

54. Plaintiff subsequently explained that publicly circulated portions of his remarks did not communicate the entire context of the broader discussion.

55. Plaintiff explained that his comments arose from personal experiences after immigrating to the United States, including negative encounters as well as positive relationships with African Americans.

56. Plaintiff further stated that his experiences were personal and were not intended to establish that the character of an entire racial group could be judged by those experiences.

57. Whether Defendant accepted that explanation or not, the City's disciplinary action remained directed at Plaintiff's speech.

**D. THE SPEECH BECAME A POLITICAL AND PUBLIC CONTROVERSY BECAUSE ALVERO WAS AN ELECTED OFFICIAL.**

58. Plaintiff's speech rapidly became a matter of widespread public controversy.

59. Numerous media organizations reported upon the video.

60. Those reports repeatedly identified Plaintiff as a member of the Clay County School Board.

61. The public controversy was not confined to JFRD.

62. Elected officials publicly responded to Plaintiff's remarks.

63. Political organizations publicly responded.
64. Community organizations publicly responded.
65. Constituents publicly responded.
66. Members of the public called for Plaintiff to resign from his elected School Board office.
67. Members of the Clay County School Board publicly addressed the controversy.
68. Public commenters appeared before the School Board to demand political accountability.
69. The Florida Commissioner of Education also became involved.
70. Plaintiff was directed to appear before the Florida State Board of Education concerning the controversy surrounding his public remarks and his responsibilities as a School Board member.
71. The controversy therefore centered substantially upon Plaintiff's position as an elected official and whether his speech should have political consequences for his continued service in that office.
72. The reaction to Plaintiff's speech confirms its public character.
73. The speech became the subject of governmental, political, educational, media, and community debate.
74. It was not a private dispute between Plaintiff and his JFRD supervisor.
75. It was not a confidential employee complaint.
76. It was not speech about an internal personnel matter.

77. The form, content, and context of the speech placed it squarely within public discourse.

**E. JFRD DISCIPLINED ALVERO BECAUSE OF THE CONTENT OF HIS SPEECH.**

78. After Plaintiff's speech became publicly controversial, JFRD initiated disciplinary proceedings against him.

79. There is no need to speculate concerning the cause of the City's action.

80. JFRD expressly identified Plaintiff's Facebook video and its contents as the basis for discipline.

81. JFRD charged Plaintiff with violations of:

a. JFRD Rules and Regulations 100.04.03 – Personal Conduct;

b. JFRD Standard Administrative Procedure 333 – Discrimination/Harassment;

c. City of Jacksonville Employee Services Directive 0528 – Anti-Harassment and Discrimination Policy and Complaint Procedure;

d. City of Jacksonville Employee Services Directive 0529 – Social Media – What is Acceptable/Not Acceptable;

e. City of Jacksonville Employee Services Directive 0901 – Progressive Discipline Policy and Guidelines; and

f. Civil Service Rule 9.

82. JFRD asserted that the Facebook video contained racially insensitive and disparaging language.

83. JFRD further asserted that Plaintiff's statements were contrary to Department standards and potentially disruptive.
84. Plaintiff denied that his off-duty speech constituted unlawful workplace discrimination or harassment.
85. Plaintiff specifically disputed the City's characterization of the speech and explained that portions circulated publicly omitted relevant context.
86. Regardless of whether Defendant agreed with Plaintiff's views or explanation, the conduct being punished was expression.
87. Plaintiff was disciplined for what he said.

**F. THE CITY'S OWN SOCIAL-MEDIA POLICY EXPRESSLY RECOGNIZES FIRST AMENDMENT LIMITS.**

88. Defendant maintains Employee Services Directive 0529 governing employee social-media activity.
89. Directive 0529 expressly recognizes that City employees retain constitutional rights.
90. The Directive specifically states that the policy shall not be enforced in a manner that abridges or interferes with rights secured by the First Amendment to the United States Constitution.
91. Defendant's policy also expressly recognizes that there is no general restriction on an employee's personal use of social media outside the office.
92. The policy further states that it is not intended to interfere with employees' legal rights.

93. Directive 0529 identifies specified circumstances in which social-media activity may support employment discipline.

94. Among them is social-media activity likely to create a real threat of immediate disruption in the workplace.

95. Defendant therefore recognized in its own written policy that the City's authority over employee speech is constitutionally limited.

96. JFRD imposed a formal Level 1 Written Reprimand against Plaintiff, a true and correct copy of which is attached hereto as **Exhibit "A."**.

**G. THE CITY IMPOSED FORMAL AND CONSEQUENTIAL DISCIPLINE.**

97. JFRD imposed a formal Level 1 Written Reprimand against Plaintiff.

98. JFRD additionally ordered Plaintiff to complete Title VII Compliance-Race Training.

99. The Written Reprimand constituted formal employment discipline.

100. It became part of Plaintiff's employment history.

101. The Written Reprimand was not merely an informal conversation.

102. It was not non-disciplinary counseling.

103. It placed Plaintiff on heightened notice concerning future discipline.

104. JFRD expressly warned Plaintiff that further conduct deemed improper could lead to increasingly severe punishment.

105. That threatened punishment included dismissal from employment.

106. The discipline therefore carries consequences beyond the date on which it was issued.

107. Defendant imposed the discipline notwithstanding Plaintiff's clean disciplinary history.

108. Defendant would not have imposed the Written Reprimand and mandatory training absent Plaintiff's speech.

109. The causal connection is therefore not circumstantial.

110. Plaintiff's speech was the express basis for Defendant's action.

**H. THE CITY IDENTIFIED OFFENSE AND CONCERN, NOT CONCRETE IMPAIRMENT OF FIRE-RESCUE OPERATIONS.**

111. Plaintiff challenged Defendant's discipline through the City's Civil Service grievance process.

112. The Jacksonville Civil Service Board conducted a hearing on September 10, 2026.

113. Plaintiff testified on his own behalf.

114. JFRD relied upon testimony from Fire Chief/Director Percy Golden and Chief Dallas Cooke.

115. On September 16, 2026, the Civil Service Board entered an Order Denying Grievance, a true and correct copy of which is attached hereto as **Exhibit "B."** According to that Order, several JFRD employees expressed that they were upset or concerned about Plaintiff's views.

116. The Order further states that Chief Golden and Chief Cooke were personally offended by Plaintiff's video.

117. Chief Golden expressed his opinion that the speech was harmful to workplace cohesion and could affect morale, relationships, and unity.

118. The Order ultimately characterized those circumstances as establishing actual disruption.

119. But the concrete facts identified by Defendant tell a materially narrower story.

120. Defendant identified no emergency response delayed because of Plaintiff's speech.

121. Defendant identified no fire-rescue operation impaired because of Plaintiff's speech.

122. Defendant identified no citizen who went without emergency services because of Plaintiff's speech.

123. Defendant identified no incident in which Plaintiff failed or refused to perform an assigned duty.

124. Defendant identified no incident in which Plaintiff refused to work with another firefighter.

125. Defendant identified no incident in which another firefighter refused to work with Plaintiff.

126. Defendant identified no instance in which Plaintiff's speech rendered him incapable of responding to an emergency.

127. Defendant identified no decline in Plaintiff's actual job performance.

128. Defendant identified no racially discriminatory treatment by Plaintiff toward any person while Plaintiff was performing his JFRD duties.

129. Defendant identified no citizen whom Plaintiff refused to assist because of race.

130. Defendant identified no workplace statement by Plaintiff directed at a JFRD employee on account of race.

131. Defendant identified no racially discriminatory employment decision made by Plaintiff.

132. Defendant identified no interruption in the delivery of fire-rescue services caused by Plaintiff's speech.

133. The identifiable reaction consisted principally of controversy, employee upset, employee concern, personal offense, and predictions regarding possible effects on morale and cohesion.

134. Those reactions demonstrate that Plaintiff's speech was controversial.

135. They do not establish that the First Amendment ceased to apply.

136. Government cannot manufacture an operational injury merely by giving the label “disruption” to disagreement with controversial expression.

137. Nor can it circumvent the First Amendment simply because some government employees take offense at another employee's citizen speech.

**I. THE CIVIL SERVICE BOARD TREATED PUBLIC SPEECH AS MERELY PRIVATE SPEECH.**

139. The Civil Service Board expressly considered Plaintiff's First Amendment position.

140. The Board acknowledged that Defendant's Social Media Policy must be enforced consistently with the United States Constitution.

141. The Board nevertheless determined that Plaintiff's speech was not speech concerning a matter of public concern.

142. The Board reasoned, among other things, that Plaintiff was not speaking as a public official and did not expressly call for community action or change.

143. It characterized the speech as Plaintiff's personal opinion based upon his experiences.

144. That conclusion disregards the complete content, form, and context of the expression.

145. Plaintiff was a sitting elected member of the Clay County School Board when he spoke.

146. Plaintiff was not discussing his vacation request, compensation, shift assignment, supervisor, or another private employment matter.

147. He was discussing race, culture, social relations, personal experiences, and a nationally debated political commentator.

148. The speech immediately generated political responses.

149. It immediately generated governmental responses.

150. It immediately generated substantial news coverage.

151. It immediately generated demands concerning Plaintiff's continued service in elected office.

152. It became the subject of proceedings and public comment before governmental education bodies.

153. Speech need not expressly demand a new statute, organize a protest, or call for community action to concern matters of public interest.

154. Nor does the inclusion of personal experience automatically transform publicly expressed views about political or social subjects into a private workplace grievance.

155. Under *Connick v. Myers*, 461 U.S. 138, 147–48 (1983), whether speech concerns a matter of public concern requires consideration of its content, form, and context.

156. The content, form, and context alleged here demonstrate that Plaintiff's speech operated within public political and social discourse.

**J. PUBLIC EMPLOYEES DO NOT FORFEIT THEIR FIRST AMENDMENT RIGHTS BY ACCEPTING GOVERNMENT EMPLOYMENT.**

157. More than half a century ago, the Supreme Court rejected the proposition that government may condition public employment upon surrender of constitutional speech rights.

158. In *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968), the Supreme Court held that courts must balance the interests of a public employee, as a citizen commenting upon matters of public concern, against the government's legitimate interest as an employer in efficiently providing public services.

159. In *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006), the Supreme Court distinguished speech made pursuant to an employee's official duties from speech made as a citizen.

160. Plaintiff's speech was not made pursuant to his JFRD duties.

161. Plaintiff's responsibilities as a firefighter did not require him to publish the Facebook video.

162. JFRD did not direct Plaintiff to make it.

163. JFRD did not compensate Plaintiff to make it.

164. The speech therefore was not government-created employee speech under *Garcetti*.

165. In *Lane v. Franks*, 573 U.S. 228, 236 (2014), the Supreme Court reaffirmed that public employees do not renounce their citizenship by accepting government employment.

166. The protection afforded to public employees is especially significant where they speak outside their ordinary employment responsibilities.

167. Plaintiff's speech satisfies that threshold requirement.

**K. CONTROVERSIAL SPEECH DOES NOT LOSE FIRST AMENDMENT PROTECTION SIMPLY BECAUSE IT OFFENDS.**

168. Defendant may strongly disagree with Plaintiff's statements.

169. Individual firefighters may find Plaintiff's statements offensive.

170. Members of the public may find Plaintiff's statements offensive.

171. None of those reactions, standing alone, answers the constitutional question.

172. In *Rankin v. McPherson*, 483 U.S. 378 (1987), the Supreme Court evaluated First Amendment protection for highly controversial speech by a public employee by examining the content, form, context, and employment circumstances surrounding the statement.

173. The First Amendment does not protect only polite, conventional, or government-approved viewpoints.

174. Were that the rule, constitutional protection would be unnecessary precisely when it matters most.

175. Plaintiff does not ask this Court to endorse his statements.

176. He asks this Court to enforce the constitutional line between public criticism of speech and government retaliation against the speaker.

177. The public was free to criticize Plaintiff.

178. Other elected officials were free to criticize Plaintiff.

179. Plaintiff's constituents were free to criticize Plaintiff.

180. His political opponents were free to criticize Plaintiff.

181. His coworkers were free to criticize Plaintiff.

182. The issue presented here is different.

183. Defendant used governmental employment authority to impose formal discipline upon Plaintiff because he spoke.

**L. JFRD'S STATUS AS A FIRE DEPARTMENT DOES NOT CREATE A FIRST AMENDMENT-FREE ZONE.**

184. Plaintiff recognizes that fire departments possess important interests in discipline, trust, teamwork, and the efficient delivery of emergency services.

185. Those legitimate interests are relevant to the balancing required by *Pickering*.

186. They are not a categorical exemption from the First Amendment.

187. Public-safety employees remain public employees with constitutional rights.

188. The employer's interest must relate meaningfully to the actual operation of the governmental workplace.

189. Defendant cannot satisfy that inquiry merely by invoking the abstract concepts of morale, discipline, harmony, or trust.

190. The Court must consider the speech, Plaintiff's employment role, the context in which he spoke, the relationship between the speech and his duties, and the nature of the interference claimed by Defendant.

191. Here, Plaintiff spoke off duty on subjects unrelated to his firefighting responsibilities.

192. His speech became part of an extensive political and governmental controversy tied substantially to his elected position.

193. Plaintiff maintained a clean employment record.

194. Defendant did not identify any failure by Plaintiff to perform an emergency-service obligation.

195. The circumstances therefore require an actual constitutional balance rather than automatic deference based solely upon JFRD's status as a fire department.

**M. THE CAUSAL CONNECTION BETWEEN THE SPEECH AND THE DISCIPLINE IS DIRECT.**

196. Plaintiff need not rely solely upon temporal proximity to establish causation.

197. Plaintiff need not speculate concerning Defendant's motive.

198. Defendant expressly identified Plaintiff's speech as the basis for its disciplinary action.

199. The Notice of Disciplinary Action referred to the Facebook video.

200. The rule-infraction charges referred to the Facebook video.

201. The Civil Service grievance concerned the Facebook video.

202. Defendant defended the disciplinary action because of the Facebook video.

203. The Civil Service Board adjudicated whether Defendant could maintain the discipline arising from the Facebook video.

204. Plaintiff's speech was therefore a substantial and motivating factor in Defendant's adverse action.

205. Indeed, according to Defendant's own documents, the speech was the reason for the discipline.

**N. THE WRITTEN REPRIMAND WAS AN ADVERSE EMPLOYMENT ACTION AND CONTINUES TO CARRY CONSEQUENCES.**

206. Defendant formally reprimanded Plaintiff because of the speech.

207. The Eleventh Circuit recognizes reprimands among the types of employment action capable of supporting a First Amendment retaliation claim. See *Stavropoulos v. Firestone*, 361 F.3d 610, 619 (11th Cir. 2004).

208. Defendant's Written Reprimand remains part of Plaintiff's employment history.

209. Defendant's own disciplinary system treats a Written Reprimand as formal discipline.

210. The discipline places Plaintiff on heightened notice that subsequent alleged misconduct may lead to more severe sanctions.

211. Defendant expressly warned Plaintiff that future conduct could result in dismissal.

212. The continued existence of the disciplinary action therefore has prospective consequences.

213. It may be used against Plaintiff in future progressive discipline.

214. It also places Plaintiff on notice that Defendant claims authority to punish similar off-duty speech in the future.

215. Such governmental action burdens and chills Plaintiff's exercise of First Amendment rights.

**O. THE CONSTITUTIONAL VIOLATION IS ATTRIBUTABLE TO THE CITY OF JACKSONVILLE.**

216. Plaintiff brings this claim against the City itself.

217. Plaintiff does not rely upon respondeat superior.

218. Defendant maintained the official City and JFRD policies expressly invoked to discipline Plaintiff.

219. Defendant's authorized officials applied those policies through the City's established disciplinary system.

220. The disciplinary action was thereafter maintained through Defendant's formal Civil Service grievance process.

221. The Civil Service Board issued a final administrative decision maintaining the discipline after expressly addressing and rejecting Plaintiff's First Amendment position.

222. Defendant therefore continues to maintain the challenged Written Reprimand as an official governmental employment action.

223. The constitutional injury alleged herein resulted from Defendant's enforcement and application of official governmental policies and decisions.

224. Municipal liability therefore exists under 42 U.S.C. § 1983 and *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

## **COUNT I – FIRST AMENDMENT RETALIATION**
## **42 U.S.C. § 1983**
### **Defendant formally disciplined Plaintiff because of citizen speech concerning matters of public concern even though the speech occurred off duty, outside his JFRD responsibilities, and without concrete operational harm sufficient to outweigh his constitutional interests.**

225. Plaintiff realleges paragraphs 1 through 224 as though fully set forth herein.

226. The First Amendment, applicable to Defendant through the Fourteenth Amendment, prohibits a governmental employer from retaliating against an employee for constitutionally protected citizen speech.

227. Plaintiff spoke as a citizen.

228. Plaintiff did not speak pursuant to his responsibilities as a JFRD firefighter.

229. Plaintiff's speech occurred while he was off duty.

230. Plaintiff used his personal social-media account.

231. Plaintiff's speech existed independently of his employment with Defendant.

232. Plaintiff was simultaneously a sitting elected member of the Clay County School Board.

233. His speech concerned race, culture, political commentary, social issues, and subjects that became the focus of widespread political and governmental debate.

234. Plaintiff therefore spoke upon matters of public concern.

235. The public character of the speech is further demonstrated by its form and context.

236. It was publicly disseminated.

237. It generated extensive press coverage.

238. It generated political responses.

239. It generated governmental responses.

240. It generated public proceedings concerning Plaintiff's continued service in elected office.

241. It prompted action by Florida education officials.

242. Plaintiff's speech therefore falls within the citizen/public-concern framework established by *Pickering v. Board of Education*, 391 U.S. 563 (1968), *Connick v. Myers*, 461 U.S. 138 (1983), *Garcetti v. Ceballos*, 547 U.S. 410 (2006), and *Lane v. Franks*, 573 U.S. 228 (2014).

243. Plaintiff's interest in participating in public political and social discourse was substantial.

244. The public likewise had an interest in hearing the views of a sitting elected School Board member and responding to those views through political and civic processes.

245. Defendant possessed legitimate interests in maintaining an effective fire-rescue department.

246. But those interests did not authorize Defendant automatically to punish Plaintiff for controversial off-duty speech.

247. Defendant identified no failed emergency response caused by Plaintiff.

248. Defendant identified no refusal to perform assigned duties.

249. Defendant identified no refusal by firefighters to work with Plaintiff.

250. Defendant identified no inability by Plaintiff to work with other firefighters.

251. Defendant identified no actual decline in Plaintiff's job performance.

252. Defendant identified no instance of racially discriminatory conduct by Plaintiff toward a citizen in the performance of his duties.

253. Defendant identified no concrete interruption in JFRD's provision of public services attributable to Plaintiff's speech.

254. The principal concrete reactions identified by Defendant consisted of offense, upset, concern, criticism, and asserted effects upon morale and cohesion.

255. Under the circumstances alleged, those interests do not outweigh Plaintiff's substantial First Amendment interest in speaking as an off-duty citizen upon matters of public concern.

256. Defendant subjected Plaintiff to an adverse employment action.

257. Defendant imposed a formal Level 1 Written Reprimand.

258. Defendant compelled Plaintiff to undergo Title VII Compliance-Race Training.

259. Defendant placed the discipline in Plaintiff's employment history.

260. Defendant warned Plaintiff that future conduct could result in progressively more serious sanctions, including termination.

261. Such discipline would deter a reasonable public employee from engaging freely in comparable protected expression.

262. Plaintiff's protected speech was a substantial and motivating factor in the adverse employment action.

263. Indeed, Defendant expressly identified Plaintiff's speech as the basis of its discipline.

264. Defendant therefore retaliated against Plaintiff because of his exercise of rights protected by the First Amendment.

265. Defendant's conduct caused Plaintiff constitutional injury.

266. Plaintiff has suffered damages as a direct and proximate result of Defendant's unconstitutional conduct.

267. Plaintiff is entitled to compensatory damages to the extent proven at trial.

268. Plaintiff is entitled to nominal damages for the completed deprivation of his First Amendment rights.

269. Plaintiff is entitled to declaratory relief establishing that Defendant's disciplinary action violated the First Amendment.

270. Plaintiff is further entitled to prospective injunctive relief because the Written Reprimand remains part of his employment history and may be used to impose enhanced discipline in the future.

271. Plaintiff is entitled to an order requiring Defendant to rescind, expunge, or otherwise remove the challenged Written Reprimand and related disciplinary consequences from his employment records.

272. Plaintiff is further entitled to an injunction prohibiting Defendant from relying upon the challenged discipline as prior discipline or as a basis for enhancing future adverse employment action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff ROBERT P. ALVERO respectfully requests that this Court enter judgment in his favor and against Defendant CITY OF JACKSONVILLE, FLORIDA, and:

A. DECLARE that Defendant violated Plaintiff's rights under the First and Fourteenth Amendments by disciplining Plaintiff for the speech described herein;

B. ENTER PERMANENT INJUNCTIVE RELIEF requiring Defendant to rescind, expunge, seal, or otherwise remove the Written Reprimand and associated disciplinary consequences from Plaintiff's personnel and employment records;

C. ENJOIN DEFENDANT from relying upon the challenged Written Reprimand as prior discipline or as a basis for enhancing any future disciplinary action against Plaintiff;

D. Award Plaintiff all compensatory damages proven at trial;

E. Award Plaintiff nominal damages for the deprivation of his constitutional rights;

F. Award Plaintiff his reasonable attorneys' fees and litigation expenses pursuant to 42 U.S.C. § 1988;

G. Award Plaintiff his taxable costs;

H. Award Plaintiff prejudgment and post-judgment interest to the extent permitted by law; and

I. Grant such other and further relief as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

Dated: September 22, 2026

Respectfully submitted,

*/s/ Anthony F. Sabatini*
ANTHONY F. SABATINI
Florida Bar No. 1018163
anthony@sabatinilegal.com
SABATINI LAW FIRM, P.A.
1601 E. 1st Ave.
Mount Dora, Florida 32757
Telephone: (352) 455-2928

*/s/ Gavin B. Rollins*
GAVIN B. ROLLINS, ESQ.
FL BAR No. 1064417
gavin@sabatinilegal.com
SABATINI LAW FIRM, P.A.
1601 E. 1st AVENUE
MOUNT DORA, FL 32757
T: (352)-328-4892

# EXHIBIT A

# NOTICE OF DISCIPLINARY ACTION

## Written Reprimand

**TO:** Firefighter Robert P. Alvero #79681 E57-B

**FROM:** Steven A. Riska, Division Chief of Operations

**RE:** **Case # C2-26**

---

Your conduct as an employee of the Jacksonville Fire and Rescue Department (JFRD) constitutes a violation of applicable laws, departmental rules, regulations, guidelines, and/or procedures, and therefore warrants formal disciplinary action:

### Nature of Conduct

The Jacksonville Fire and Rescue Department has reviewed your Facebook video posted on or about December 22, 2025, and determined that it contains language that is racially insensitive and can be perceived as disparaging toward African American individuals. These comments have since been publicly circulated and reported on by multiple media outlets. Your statements violate the standards of conduct expected of JFRD personnel.

Your conduct is inconsistent with JFRD's core values of professionalism and respect for all members of the community. This conduct violates City and departmental standards regarding anti-harassment, personal conduct of a JFRD employee, and social media. Your conduct erodes public confidence in the Department's ability to serve all residents impartially, and potentially creates an offensive working environment that is disruptive. Furthermore, the decision to record and upload such a video to social media demonstrates poor judgment.

### JFRD and Civil Service Rule Violations

**JFRD Rules and Regulations** 100.04.03 – Personal Conduct
**JFRD SAP 333** - Discrimination/Harassment
**COJ Directive 0528**: Anti-Harassment and Discrimination Policy & Complaint Procedure
**COJ Directive 0529**: Social Media - What is Acceptable/Not Acceptable
**COJ Directive 0901**: Progressive Discipline Policy and Guidelines
Civil Service Rules and Regulations
Rule 9.05(1)(a)(d)(e)(f)

# NOTICE OF DISCIPLINARY ACTION

Written Reprimand

## Current Disciplinary Action of the Jacksonville Fire and Rescue Department

Your conduct requires disciplinary action. It is of the utmost importance that you know and follow Department rules, regulations, guidelines and procedures. A disruption in the delivery of essential services to the public and the efficient operation of the Jacksonville Fire and Rescue Department occurs when an employee fails to perform and abides by these rules. The JFRD has invested a significant amount of time, effort and resources training you and recognizes your value to the Department. For these reasons you will receive this:

**Written Reprimand**
**Title VII Compliance—Race Training**

## Past Discipline and Conduct

None

## Warning

**Further improper conduct on your part may lead to your more severe disciplinary action including dismissal.** It is the hope of the City of Jacksonville that such action will not become necessary and that you and the City can have a successful and continuing working relationship.

## Employee Assistance Program

If you have personal problems, please consult with the Employee Assistance Program. The City of Jacksonville offers you an Employee Assistance Program which provides counseling and other assistance to City employees and their families. The program provides help for personal or job-related family, financial, alcohol and drug and stress problems **and any other problems** you may have. The phone numbers for the Employee Assistance Program are 1-800-327-9757 and (904)-296-9436. This program is confidential. All employees are encouraged to use this benefit and service.

Jacksonville
Where Florida Begins.

515 N. Julia Street | Jacksonville, FL 32202 | Phone: 904.255.3306 | Fax: 904.255.7776 | tstivers@coj.net

JACKSONVILLE FIRE AND RESCUE DEPARTMENT
FIRE CITY OF JACKSONVILLE, FL RESCUE

# NOTICE OF DISCIPLINARY ACTION

## Written Reprimand

### Right to Appeal

In the event you choose not to voluntarily accept this disciplinary action, it will be your duty and responsibility to appeal this action in accordance with the Civil Service Rule 9.05(2)(c). Failure to notify the Civil Service Board (Civil Service Board Office, 231 East Forsyth Street, Suite 420, Jacksonville, Florida) of your desire for a hearing, shall constitute a waiver of any further right to appeal. Alternatively, you may also choose to grieve this action in accordance with Article 25 of the IAFF L122 collective bargaining agreement. You may elect only one avenue of appeal.

### Voluntary Waiver of Hearing

I acknowledge and accept the disciplinary action outlined in this document and voluntarily waive the right to file a grievance under Article 25 of the IAFF L122 collective bargaining agreement, as well as the right to appeal through the Civil Service Board.

| | |
|---|---|
| Employee RTS | 03-10-2026 |
| Employee | Date |
| [signature] | 03-10-2026 |
| Witness | Date |
| | |
| Witness | Date |



515 N. Julia Street | Jacksonville, FL 32202 | Phone: 904.255.3306 | Fax: 904.255.7776 | tstivers@coj.net

# NOTICE OF DISCIPLINARY ACTION

Written Reprimand

**Acknowledgment of Receipt**

I acknowledge receipt of this document.

Employee ______________________ Date 3/10/2026

Original - Employee's Personnel File (JFRD)
Copies - Employee
Division Chief

SAR/tbs

Jacksonville
Where Florida Begins.

515 N. Julia Street | Jacksonville, FL 32202 | Phone: 904.255.3306 | Fax: 904.255.7776 | tstivers@coj.net

# Rebuttal

**Robert Alvero** <robertoalvero2@gmail.com> Tue, Mar 3, 2026 at 8:50 PM
To: Robert Alvero <robertoalvero2@gmail.com>

The allegations of discrimination and harassment are false. The video that circulated online was made up of short clips taken out of a much longer recording, removing the context necessary to understand what I was actually saying.
In the full video, I discussed cultural differences and how misunderstandings shaped my personal experiences. I spoke about negative encounters I had within both the Black community and my own Hispanic community. I expressed hurt over how I was treated and said I chose to distance myself from individuals who treated me poorly. I also acknowledged that, in hindsight, many of these conflicts stemmed from cultural differences, not hatred or discrimination.
I referenced a YouTube interview discussing poverty and crime in underserved communities, which reminded me of my time living in downtown Jacksonville in 2008. At that time, I had just arrived from Cuba. I did not speak English, had no job, and had left my family behind. While living with a friend on 44th Street, I experienced name calling, verbal abuse, and even physical assaults.
I shared these experiences to explain how language barriers and unfamiliarity with a new culture can create fear, distrust, and conflict. I also made clear that I met kind, supportive individuals during that time, many of whom I remain friends with today, friends who helped me understand the culture and learn English. Through that growth, I became financially independent and eventually moved forward.
The edited clips misrepresented a personal story about cultural misunderstanding and resilience as something discriminatory, which it was not.

Respectfully

Robert Alvero

# Jacksonville Fire and Rescue Department
## Rule Infraction Charges

Employee Name: FF. Robert Alvero
Assignment: E57-B
Date: 03/03/2026
Employee Number: 79681

You have the right to representation.

You have a right to enter a rebuttal into the record in the space below. Return the rebuttal to your supervisor within 72 hours of receipt of this document.

I Respectfully disagree with the charges. On the next Page, you will find my Rebuttal.
Thank you for considering my perspective.

Supervisor's Signature: [signature]
Date: 3/3/26
13:17

Employee's Signature: [signature]
Date: 3/3/26





Original - Compliance Officer
Copies to- Employee and Supervisor

# Jacksonville Fire and Rescue Department
# Rule Infraction Charges

Employee Name: FF. Robert Alvero

Date: 03/03/2026

Assignment: E57-B

Employee Number: 79681

## You are hereby charged with violating one or more of the following:

*Cite Article or Rule below*

| | |
|---|---|
| Provisions of the Jacksonville Fire and Rescue Department | JFRD Rules & Regulations 100.04.03 - Personal Conduct |
| Rule(s) of the Jacksonville Fire and Rescue Department | COJ Directive 0528: Anti-Harassment and Discrimination Policy & Complaint Procedure<br>COJ Directive 0529: Social Media - What is Acceptable/Not Acceptable<br>COJ Directive 0901: Progressive Discipline Policy and Guidelines |
| SOP(s) of the Jacksonville Fire and Rescue Department | |
| SAP(s) of the Jacksonville Fire and Rescue Department | JFRD SAP 333 - Discrimination/Harassment |
| Civil Service and Personnel Rules and Regulations | Rule 9.05 (1)(a)(d)(e)(f) |

Details of Charges and Supporting Data:

The Jacksonville Fire and Rescue Department has reviewed your Facebook video posted on or about December 22, 2025, and determined that it contains language that is racially insensitive and can be perceived as disparaging toward African American individuals. These comments have since been publicly circulated and reported on by multiple media outlets. Your statements violate the standards of conduct expected of JFRD personnel.

Your conduct is inconsistent with JFRD's core values of professionalism and respect for all members of the community. This conduct violates City and departmental standards regarding anti-harassment, personal conduct of a JFRD employee, and social media. Your conduct erodes public confidence in the Department's ability to serve all residents impartially, and potentially creates an offensive working environment that is disruptive. Furthermore, the decision to record and upload such a video to social media demonstrates poor judgment.

Supervisor's Name: TONY STIVERS

Supervisor's Assignment: HQ

Supervisor's Signature: [signature]

*Employee's signature confirms receipt of a copy of these charges*

Employee's Signature: [signature]

Date: 3/3/26 Time: 1320



Original - Compliance Officer
Copies to- Employee and Supervisor

# Jacksonville Fire and Rescue Department
## Rule Infraction Charges

Employee Name: FF. Robert Alvero

Assignment: E57-B

Date: 03/03/2026

Employee Number: 79681

You have the right to representation.

You have a right to enter a rebuttal into the record in the space below. Return the rebuttal to your supervisor within 72 hours of receipt of this document.

Supervisor's Signature: [signature]

Date: 3/3/26
13:17

Employee's Signature: [signature]

Date: 3/3/26





Original - Compliance Officer
Copies to- Employee and Supervisor

100.04.02 Respect of Rank

All JFRD personnel shall receive the proper respect due their rank and shall not allow any other personnel or visitor to speak disrespectfully of the JFRD or its employees.

Personnel shall always be addressed by their appropriate title or rank and shall be referred to in a like manner when not being directly addressed.

100.04.03 Personal Conduct

While on duty, all personnel shall always conduct themselves in an orderly and acceptable manner.

Personnel shall abstain from abusive language and unbecoming conduct.

Personnel shall perform their duties in an efficient, orderly, and courteous manner. They shall also employ patience and good judgment at all times.

JFRD personnel shall serve the public in ways that do not interfere with the discharge of their assigned responsibilities. They shall respect the rights of individuals and perform their service with honesty.

Personnel shall treat all people with respect. They shall be courteous and considerate towards the general public and other JFRD personnel.

All JFRD personnel are required to speak honestly at all times, whether under oath or not.

Personnel are prohibited from taking or removing any property from any premises to which the JFRD responds.

Gambling is strictly forbidden on JFRD property.

Personnel who are absent or late without proper notification and permission shall be considered *absent without leave* (AWOL) and shall be disciplined accordingly.

Any material that might be considered offensive shall be secured out of view from the public.

At emergency scenes, personnel shall operate with the maximum degree of professionalism. Inappropriate conduct will generate sufficient cause for disciplinary action.

# ANTI-HARASSMENT AND DISCRIMINATION POLICY SUMMARY

The City of Jacksonville is committed to a work environment in which all individuals are treated with respect and dignity. Each individual has the right to work in a professional and businesslike work environment free from all forms of unlawful discriminatory practices, including harassment. Therefore, the City of Jacksonville expects that all relationships among persons in the workplace will remain professional and free of harassment, discrimination, and bias.

**DEFINITIONS**

Harassment is a form of employment discrimination that may violate employment laws.

- Sexual harassment, for the purposes of this policy, is defined as unwelcome sexual advances, requests for sexual favors and other verbal or physical conduct of a sexual nature. Sexual harassment may involve individuals of the same or different gender.
- Harassment on the basis of any other protected characteristic also is strictly prohibited (race, color, religion, sex, sexual orientation, gender identity, national origin, age, disability, marital status, citizenship or immigration status, veteran status, genetic information, etc). Harassing conduct includes, but is not limited to, slurs or negative stereotyping; threatening, intimidating or hostile acts; and written or graphic material that shows hostility toward an individual or group.

**CONFIDENTIALITY**

Pursuant to Florida law, the City of Jacksonville will maintain all complaints and other records which relate to a complaint of harassment or discrimination in the workplace as confidential until the investigation is completed or the file becomes inactive.

**REPORTING AN INCIDENT**

Individuals who believe they have been the victims of conduct prohibited by this policy or who believe they have witnessed such conduct should immediately:

- discuss with their immediate supervisor, department head or division chief;
- report the conduct directly to both the City's Office of Equal Opportunity/Equal Access and the Employee and Labor Relations Division;
- Send a confidential email to Anti-Discrimination Harassment Reporting COJAHAD@coj.net.

**VIOLATIONS**

Retaliation against an individual for reporting harassment or discrimination is a serious violation of this policy and, like harassment or discrimination itself, will be subject to disciplinary action. Acts of retaliation should be reported immediately and will be promptly investigated and addressed.

Misconduct constituting harassment, discrimination or retaliation will be dealt with appropriately. Responsive action may include, for example, training, referral to counseling and/or disciplinary action such as a reprimand, withholding of a promotion or pay increase, reassignment, temporary suspension without pay or termination, as the City of Jacksonville believes appropriate under the circumstances.

| EMPLOYEE SERVICES<br><br>Directive - 0528 | Date: 07/06/2018<br><br>Previously Revised: 01/16/2018<br><br>Established: 08/05/2015 |
|---|---|

# ANTI-HARASSMENT AND DISCRIMINATION POLICY AND COMPLAINT PROCEDURE

The City of Jacksonville is committed to a work environment in which all individuals are treated with respect and dignity. Each individual has the right to work in a professional and businesslike work environment free from all forms of unlawful discriminatory practices, including harassment. Therefore, the City of Jacksonville expects that all relationships among persons in the workplace will remain professional and free of harassment, discrimination, and bias.

The City of Jacksonville encourages reporting of all perceived incidents of harassment or discrimination. It is the policy of the City of Jacksonville to promptly and thoroughly investigate such reports. The City of Jacksonville prohibits retaliation against any individual who reports harassment or participates in an investigation of such reports.

**Types/Definitions of Harassment**

Harassment is a form of employment discrimination that may violate employment laws such as Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act of 1967 (ADEA), and/or the Americans with Disabilities Act (ADA).

1. Sexual harassment constitutes discrimination and is illegal under federal, state and local laws. For the purposes of this policy, sexual harassment is defined in the Equal Employment Opportunity Commission Guidelines as unwelcome sexual advances, requests for sexual favors and other verbal or physical conduct of a sexual nature when, for example: (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment; (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual; or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance and/or creating an intimidating, hostile or offensive working environment.

   Sexual harassment may include a range of subtle or explicit behaviors and may involve individuals of the same or different gender. Depending on the circumstances, these behaviors may include, but are not limited to: unwanted sexual advances or requests for sexual favors; sexual jokes and innuendo; verbal abuse of a sexual nature; comments about an individual's body, sexual prowess or sexual deficiencies; leering, whistling or touching; insulting or obscene

comments or gestures; displaying sexually suggestive objects or pictures in the workplace; and other physical, verbal or visual conduct of a sexual nature.

2. Harassment on the basis of any other protected characteristic also is strictly prohibited. Under this policy, harassment is verbal, written or physical conduct that denigrates or shows hostility or aversion toward an individual because of his/her race, color, religion, sex, sexual orientation, gender identity, national origin, age, disability, marital status, citizenship or immigration status, veteran status, genetic information or any other characteristic protected by law or that of his/her relatives, friends or associates, and that: (i) has the purpose or effect of creating an intimidating, hostile or offensive work environment; (ii) has the purpose or effect of unreasonably interfering with an individual's work performance; or (iii) otherwise adversely affects an individual's employment opportunities.

   Harassing conduct includes, but is not limited to, epithets, slurs or negative stereotyping; threatening, intimidating or hostile acts; denigrating jokes and innuendo; and written or graphic material that denigrates or shows hostility or aversion toward an individual or group that is placed on walls or elsewhere in the employer's premises or circulated in the workplace, on City of Jacksonville time or using City of Jacksonville equipment, including computers, email, phones (including voice messages), text messages, social networking sites, etc.

**Individuals and Conduct Covered**

These policies apply to all applicants, employees (regardless of employment category or status), or anyone representing the City of Jacksonville on business such as a volunteer, contract worker, or vendor. The prohibition on harassment also applies to any customer, client, outside vendor or salesperson who comes on to City of Jacksonville property, travels in a City of Jacksonville vehicle, or attends a City of Jacksonville business meeting, trip or event.

Conduct prohibited by these policies is unacceptable in the workplace and in any work-related setting outside the workplace, such as during business trips, business meetings and business-related social events.

**The City's Responsibilities Under This Policy**

If the City of Jacksonville receives a report or complaint of alleged harassment, or has reason to believe that harassment is occurring, it will take the necessary steps to ensure that the matter is promptly investigated and addressed in accordance with the procedures outlined in this policy. If the allegation is determined to be credible, the City will take immediate and effective measures to end the unwelcomed behavior. The City is committed to taking action if it learns of possible harassment, even if the individual does not wish to file a formal complaint.

All management and supervisory personnel of the City of Jacksonville share responsibility for ensuring compliance with and continued implementation of this policy, including the requirement to comply with the confidentiality provision set forth below. Each supervisor and manager has a responsibility to keep the workplace free of any

form of harassment. All supervisors and managers are required to lead by example.

Supervisors and other responsible City officials who observe, are informed of, or reasonably suspect incidents of possible harassment must immediately report such incidents. Incidents will be investigated promptly and, where necessary, prompt remedial action will be taken. The City will also take the necessary steps to protect from retaliation those employees who in good faith report incidents of potential harassment. It is a violation of this policy to retaliate against someone who has reported harassment. Violators will be subject to discipline.

**Requirement to Maintain Confidentiality**

Pursuant to Florida law, the City of Jacksonville will maintain all complaints and other records which relate to a complaint of harassment or discrimination in the workplace as confidential until the investigation is completed or the file becomes inactive. The requirement to maintain confidentiality applies to any individual who becomes aware of or witnesses the harassment or participates in the investigation, including the victim, the alleged harasser, supervisors/managers, and employees conducting the investigation. Employees violating this provision may be subject to discipline, up to and including termination.

**Reporting an Incident of Harassment, Discrimination or Retaliation**

The City of Jacksonville encourages reporting of all perceived incidents of discrimination, harassment or retaliation, regardless of the offender's identity or position. If an employee feels that he or she has been harassed on the basis of his or her sex, race, national origin, ethnic background, or any other legally protected characteristic, the employee should immediately report the matter to his or her supervisor. If that person is not available, or if the employee feels it would be unproductive to inform that person, the employee should immediately contact the City's Office of Equal Opportunity/Equal Access and the Employee and Labor Relations Division of Employee Services by one of the methods listed below. Once the matter has been reported, the City of Jacksonville will promptly investigate and take necessary corrective action where appropriate. All complaints of unlawful harassment will be handled in as discreet and confidential manner as possible under the circumstances. See the complaint procedure described below.

In addition, the City of Jacksonville encourages individuals who believe they are being subjected to such conduct to promptly advise the offender that his or her behavior is unwelcome and request that it be discontinued. Often this action alone will resolve the problem. If the individual does not wish to communicate directly with the offending person, or if such communication has been ineffective, the individual should report the allegations of harassment using the complaint procedure outlined in this directive.

**Complaint Procedure**

Individuals who believe they have been the victims of conduct prohibited by this policy or who believe they have witnessed such conduct should discuss their concerns with their immediate supervisor. An employee may also simultaneously report the conduct directly to both the City's Office of Equal Opportunity/Equal Access, located at City Hall, Suite 350, and the Employee and Labor Relations Division, located at City Hall,

Suite 100, by telephone (904) 630-1121 or by sending a confidential email to Anti-Discrimination Harassment Reporting <COJAHAD@coj.net>. If the victim's immediate supervisor is the alleged harasser, the individual may discuss his or her concerns with a manager, division chief, or director within the department. The manager, division chief, or department director has a responsibility to immediately and confidentially notify the City's Office of Equal Opportunity/Equal Access and the Employee and Labor Relations Division of the conduct.

The City of Jacksonville encourages the prompt reporting of complaints or concerns so that rapid and constructive action can be taken before relationships become irreparably strained. Therefore, while no fixed reporting period has been established, early reporting and intervention has proven to be the most effective method of resolving actual or perceived incidents of harassment.

Any reported allegations of harassment, discrimination or retaliation will be investigated promptly by the City's Office of Equal Opportunity/Equal Access. Depending on the nature of the allegations and what the initial investigation discloses, the Office of Equal Opportunity/Equal Access and the Employee and Labor Relations Division may conduct a joint investigation. The investigation may include individual interviews with the parties involved and, where necessary, with individuals who may have observed the alleged conduct or may have other relevant knowledge.

Confidentiality will be maintained throughout the investigatory process to the extent consistent with the City of Jacksonville's responsibility to conduct an adequate and fair investigation and to take appropriate corrective action.

Retaliation against an individual for reporting harassment or discrimination or for participating in an investigation of a claim of harassment or discrimination is a serious violation of this policy and, like harassment or discrimination itself, will be subject to disciplinary action. Acts of retaliation should be reported immediately and will be promptly investigated and addressed.

Misconduct constituting harassment, discrimination or retaliation will be dealt with appropriately. Responsive action may include, for example, training, referral to counseling and/or disciplinary action such as a reprimand, withholding of a promotion or pay increase, reassignment, temporary suspension without pay or termination, as the City of Jacksonville believes appropriate under the circumstances.

**Conclusion**

The City of Jacksonville has developed this policy to ensure that all of its employees can work in an environment free from unlawful harassment, discrimination and retaliation. By widely disseminating this policy to all City of Jacksonville employees and anyone representing the City of Jacksonville on business, such as volunteers, contract workers and vendors, and by implementing training, the City of Jacksonville will make every reasonable effort to ensure that all concerned are familiar with this policy and are aware that any complaint in violation of this policy will be promptly investigated and resolved appropriately.

This policy should not, and may not, be used as a basis for excluding or separating individuals of a particular gender, or any other protected characteristic, from participating in business or work-related social activities or discussions. In other words, no one should make the mistake of engaging in discrimination or exclusion in order to avoid allegations of harassment. The law and the policies of the City of Jacksonville prohibit disparate treatment on the basis of sex or any other protected characteristic with regard to terms, conditions, privileges and perquisites of employment. The prohibitions against harassment, discrimination and retaliation are intended to complement and further those policies, not to form the basis of an exception to them.

Any employee who has any questions or concerns about this policies should speak with his/her HR Business Partner.

| EMPLOYEE SERVICES<br>Directive - 0529 | Date: 12/31/2025<br>Previously Revised: 12/31/2024<br>Established: 04/05/2016 |
|---|---|

## SOCIAL MEDIA – WHAT IS ACCEPTABLE/NOT ACCEPTABLE

**Scope**
This directive applies to all City of Jacksonville departments, excluding JSO who has their own policies, but includes the other constitutional offices as well as City Council. It applies to all employees who participate in any form of social media, including those performing work on behalf of the City of Jacksonville such as full-time, part-time, temporary, elected and contract employees.

**Definition**
Social Media includes a variety of applications, usually web-based, which allow users to share content, interact with each other and develop communities around similar interests. Some examples are blogs, websites, wikis, vines, discussion threads, comment sections and social networks. Social networks include (but are not limited to) Facebook, X – formerly known as Twitter, YouTube, Instagram, Snapchat, Pinterest, Google+, Ello, Tumblr, Myspace, Vimeo, Reddit, Periscope, TikTok, and numerous other similar sites.

**Employees' Rights**
Under the Public Employees Relations Act, employees have the right "to engage in "...concerted activities for the purpose of collective bargaining or other mutual aid or protection." This policy shall not be enforced, in a manner that abridges or interferes with that right, rights under the First Amendment to the United States Constitution and the Florida Constitution, or rights under any other law.

**Authorized Spokespersons of the City**
Employees may not represent themselves as a spokesperson for the City. If any City business, functions or activities are the focus or subject of the communication, the speaker should make it clear that the communication is his or her opinion and in no way represents the position or interests of the City, fellow employees, suppliers, contractors and other persons working on behalf of the City, or citizens. Do not create a link from your blog, website or other social networking site to a City website without identifying yourself as a City employee. If the City is a subject of the content you are creating, be clear and open about the fact that you are an employee. If you do publish a blog or post content online related to the work you do or subjects associated with the City, in order to make it clear that you are not speaking on behalf of the City It is best to include a disclaimer, such as "The postings on this site are my own and do not necessarily reflect the views of the City of Jacksonville or its representatives."

Some individuals performing work on behalf of the City will, by the nature of their positions, be knowledgeable about certain aspects of the City and may be authorized to speak on

behalf of the City. The City's social media participation will be handled through the Public Affairs Office in order to maintain the integrity of the City's overall communication strategies and programs. Public Affairs will establish accounts over various platforms of social communication in an incremental manner but will limit participation in order to maintain the quality of the City's presence in the digital arena. However, as public employees, certain restrictions apply regarding social media.

**Guidelines and Disciplinary Policy**

1. Employees must follow this directive as well as the current Directive – 0516, TECHNOLOGY USE POLICY and refrain from using social media while on work time or on equipment that the City provides, unless it is work-related as authorized by your manager or consistent with City policy.

2. Although there is no restriction on the personal use of social media outside of the office, good judgement is encouraged. Any time an employee chooses to write, post or submit something within the realm of social media it should be remembered that such items become public. Employees may not post any internal reports, policies, procedures or other internal business-related communications of the City or its suppliers, vendors, contractors and other persons performing work on behalf of the City.

3. This policy is not intended to intrude on employees' privacy or interfere with their legal rights. However, employees may be subject to disciplinary action for social media activity referring to any City office or function, other City employees, or citizens that is:

   - obscene;

   - false or defamatory (a communication made with the intent to harm a person's reputation or made with reckless disregard for whether the statement is true or false);

   - likely to create a hostile work environment based on a person's race, color, national origin, sex, age, disability, religion or any other status protected by law or City policy;

   - coercive or threatens physical violence; or

   - likely to create a real threat of immediate disruption in the workplace.

| | | |
|---|---|---|
| **EMPLOYEE SERVICES**<br>**Directive - 0529** | | **Date: 04/30/2019**<br>**Previously Revised: 3/21/2018**<br>**Established: 04/05/2016** |

## SOCIAL MEDIA – WHAT IS ACCEPTABLE/NOT ACCEPTABLE

**Scope**
This Directive applies to all employees who participate in any form of social media, including those performing work on behalf of the City of Jacksonville such as full-time, part-time, contract and temporary employees.

**Definition**
Social Media includes a variety of applications, usually web-based, which allow users to share content, interact with each other and develop communities around similar interests. Some examples are blogs, websites, wikis, vines, discussion threads, comment sections and social networks. Social networks include (but are not limited to) Facebook, Twitter, YouTube, Instagram, Snapchat, Pinterest, Google+, Ello, Tumblr, Myspace, Vimeo, Reddit, Periscope and numerous other similar sites.

**Employees' Rights**
Under the Public Employees Relations Act, employees have the right "to engage in "...concerted activities for the purpose of collective bargaining or other mutual aid or protection." This policy shall not be enforced, in a manner that abridges or interferes with that right, rights under the First Amendment to the United States Constitution and the Florida Constitution, or rights under any other law.

**Authorized Spokespersons of the City**
Employees may not represent themselves as a spokesperson for the City. If any City business, functions or activities are the focus or subject of the communication, the speaker should make it clear that the communication is his or her opinion and in no way represents the position or interests of the City, fellow employees, suppliers, contractors and other persons working on behalf of the City, or citizens. Do not create a link from your blog, website or other social networking site to a City website without identifying yourself as a City employee. If the City is a subject of the content you are creating, be clear and open about the fact that you are an employee. If you do publish a blog or post content online related to the work you do or subjects associated with the City, in order to make it clear that you are not speaking on behalf of the City It is best to include a disclaimer, such as "The postings on this site are my own and do not necessarily reflect the views of the City of Jacksonville or its representatives."

Some individuals performing work on behalf of the City will, by the nature of their positions, be knowledgeable about certain aspects of the City and may be authorized to speak on behalf of the City. The City's social media participation will be handled through the Public

Affairs Office in order to maintain the integrity of the City's overall communication strategies and programs. Public Affairs will establish accounts over various platforms of social communication in an incremental manner but will limit participation in order to maintain the quality of the City's presence in the digital arena. However, as public employees, certain restrictions apply regarding social media.

**Guidelines and Disciplinary Policy**

1. Employees must follow the current Directive – 0516, TECHNOLOGY USE POLICY and Directive – 0529, SOCIAL MEDIA – WHAT IS ACCEPTABLE/NOT ACCEPTABLE of the City and refrain from using social media while on work time or on equipment that the City provides, unless it is work-related as authorized by your manager or consistent with City policy.

2. Although there is no restriction on the personal use of social media outside of the office, good judgement is encouraged. Any time an employee chooses to write, post or submit something within the realm of social media it should be remembered that such items become public. Employees may not post any internal reports, policies, procedures or other internal business-related communications of the City or its suppliers, vendors, contractors and other persons performing work on behalf of the City.

3. This policy is not intended to intrude on employees' privacy or interfere with their legal rights. However, employees may be subject to disciplinary action for social media activity referring to any City office or function, other City employees, or citizens that is:

    - obscene;
    - false or defamatory (a communication made with the intent to harm a person's reputation or made with reckless disregard for whether the statement is true or false);
    - likely to create a hostile work environment based on a person's race, color, national origin, sex, age, disability, religion or any other status protected by law or City policy;
    - coercive or threatens physical violence; or
    - likely to create a real threat of immediate disruption in the workplace.

| | | |
|---|---|---|
| **EMPLOYEE SERVICES**<br><br>**Directive - 0901** | | **Date: 12/31/2024**<br><br>**Previously Revised: 10/1/2021**<br><br>**Established: 08/04/1993** |

# PROGRESSIVE DISCIPLINE POLICY AND GUIDELINES

The discipline of an employee is considered a serious action to be taken with care and objectivity, with full consideration of the rights and interest of both the employee and the department. It is imperative that disciplinary action be administered in a judicious manner that assures fair and equal treatment for all employees.

The standards for disciplinary action included in this directive have been established pursuant to the Civil Service and Personnel Rules and Regulations to help ensure that all employees receive similar treatment in like circumstances. Realizing that some of the offenses and deficiencies listed will be more serious and more frequent in certain cases, the supervisor administering the disciplinary action shall use good judgment considering all available facts in each case. The philosophy to be used is that of progressive, constructive, and cumulative discipline.

**FACT FINDING INVESTIGATIONS**

Prior to formal disciplinary action being taken, an investigation should be completed. The investigation can include reviewing relevant documents and policies, obtaining witness statements and/or holding fact finding meetings. In rare circumstances, a fact-finding meeting will not be necessary, and this determination will be made by Employee Services along with the Division Chief and/or Department Director. In preparation for a fact-finding meeting, it may be helpful to obtain statements from all employees involved.

The purpose of the fact-finding meeting is to give an employee the opportunity to tell his/her side of the story regarding allegations of misconduct, poor performance or any other matter being investigated. The employee must be notified, preferably in writing, that the results of the fact-finding meeting may lead to disciplinary action. They should also be given 24 hours advance notice of the fact-finding meeting unless the notice is detrimental to the interest of the City. If necessary, questions should be developed with the assistance of a Labor Relations Officer prior to the meeting. Employees are allowed to have representation at this meeting as defined by Weingarten Rights. It is the employee's responsibility to request and to arrange for such representation in a timely manner. At the hearing, or prior to, the employee should be notified of the reason for the fact-finding meeting and given copies of all evidence related to the fact-finding meeting.

If it is determined that no formal disciplinary action will be taken following the conclusion of the investigation, the employee should be notified by their manager, preferably in writing. Under the AFSCME contract if a decision has not been reached within 30 days of the conclusion of the investigation, then the employee must be notified that no decision has been made and given an estimated date as to when it will be concluded.

Supervisor/Managers needing clarification on the fact-finding process should seek guidance from the Employee and Labor Relations Division.

**PROGRESSIVE AND CUMULATIVE DISCIPLINE**

Disciplinary actions are based upon the concept of progressive, constructive, and cumulative discipline. Progressive discipline is based on the idea that once employees have been informed of the performance and/or behavior expected of them, they will take the necessary actions to improve. If improvement does not happen appropriate discipline will generally be administered progressively from minor to major penalties with each new infraction.

Generally, unacceptable behavior can be considered major or minor. Major disciplinary infractions are those types of behavior which, because of their serious nature, may warrant suspension or dismissal on the first occurrence, even though the employee has no prior record of being disciplined. Minor misconduct, however, can have a cumulative effect and infractions may progress to more severe levels of disciplinary action.

In determining the severity of the discipline to be applied, the following variables will be considered:

- The severity of the disciplinary violation;
- The circumstances in which the violation occurred;
- The consequences of the employee's actions regarding its effects on the department's assigned mission, on the City of Jacksonville and on other employees;
- The overall work record of the employee; and
- The length of time since earlier disciplinary actions, the similarity or dissimilarity of offense and the severity of the earlier offenses.

Other relevant factors may be appropriate to consider under unique circumstances.

Except in extraordinary situations, dismissals will not be administered unless previous discipline has been administered to the employee noticing them of performance and/or behavior expectations.

**REVIEW OF DISCIPLINE DOCUMENTS**

Before a disciplinary conclusion is reached and discipline is finalized, a discussion with a Labor Relations Officer is highly recommended.

The Employee and Labor Relations Division shall review all proposed disciplinary actions to ensure uniformity and consistency.

While Constitutional Offices are exempted from this specific provision, it is recommended that all discipline should be reviewed in this manner.

**ADMINISTRATION OF DISCIPLINE**

To assist in consistent application of this policy, disciplinary actions above the level of a Written Reprimand should be conducted in the presence of a Labor Relations Officer. The functional unit manager will maintain authority over the disciplinary action. At the end of the meeting the employee will be given a copy of the discipline.

If a supervisor/manager needs guidance on how to administer a discipline they should reach out to the Employee and Labor Relations Division.

While Constitutional Offices are exempted from this specific provision, this service is always available to all managers/supervisors throughout the city.

**TYPES OF DISCIPLINARY ACTION**

Discipline shall normally be administered in a progressive manner, and may include, but is not limited to, one or any combination of the following:

- Written Reprimand
- Reduction in Pay
- Demotion
- Suspension
- Dismissal

Written Counseling should normally precede any progressive disciplinary action. Written Counseling is not considered discipline and neither the document nor its contents are grievable. An employee under the AFSCME contract may submit a rebuttal for his/her file within 60 days of receipt of the counseling.

A Written Reprimand is designed to put an employee on heightened notice that further misconduct will most assuredly result in punitive discipline or dismissal.

**LICENSES AND CERTIFICATIONS**

An employee shall generally have thirty (30) calendar days after the loss of a driver's license, professional license or certification to regain driving privileges for work purposes

or remain employed at the position level requiring the license or certification. The thirty (30) days may be extended to ninety (90) days for acceptable cause. After ninety (90) days, the employee shall be deemed improperly equipped for duty pursuant to Civil Service Rule 8.06(4)(a) and further disciplinary action may result, up to and including termination.

**OFF DUTY CONDUCT**

An employee may receive discipline for off duty conduct if such conduct:

- Detrimentally affects the reputation of the City
- Renders the employee unable to properly discharge his or her job duties and responsibilities
- Causes other employees to refuse to or be reluctant to work with that employee
- Inhibits management's ability to effectively manage and direct its operations; or
- Erodes managements trust in the employee to the point that the employment relationship is irreparably damaged.

**COMBINATION OF UNRELATED OFFENSES**

The department may exceed normal progressive disciplinary guidelines when an employee has committed a number of unrelated offenses or if the offense itself is considered by management to be of such an egregious nature that a higher level of disciplinary action is appropriate. This decision should be consulted with the Employee and Labor Relations Division.

Examples of offenses that may lead to dismissal upon first offense (list not intended to be all inclusive):

- Possession of a weapon (or any item brandished as a weapon) or firearm
- Brandishing or threatening another person with a weapon (or any item brandished as a weapon) or firearm
- Conduct unbecoming a City employee
- Felony arrest or conviction
- Intentional falsification of records for financial gain
- Theft of City property
- Employees determined to be in violation of Employee Services Directives 0401, 0402 and/or 0403 relating to drugs and alcohol

(4) Where feasible, management shall administer discipline in a progressive manner. When progressive discipline is not followed, the department head or his/her designee shall justify the departure from this policy at any disciplinary hearing.

(5) Disciplinary action shall be for cause as indicated in these Rules and may include, but is not limited to, one or any combination of the following:

(a) Written Reprimand
(b) Reduction in Compensation
(c) Demotion
(d) Suspension without Pay
(e) Dismissal

An employee with permanent status shall not be demoted, suspended without pay, dismissed, or have his/her compensation reduced as a disciplinary action, except in accordance with these Rules. Written reprimands may only be challenged through the grievance process provided in Rule 9.03(2)(a).

(6) The Civil Service Board shall hear and determine appeals initiated by permanent employees who have been disciplined for violations of the personnel provisions of the City Charter or the Civil Service and Personnel Rules and Regulations. Demotions, suspensions without pay, dismissals, and disciplinary reductions in compensation shall be processed in accordance with these Rules.

**9.05 REDUCTION IN COMPENSATION, DEMOTIONS, SUSPENSIONS WITHOUT PAY AND DISMISSALS:**

Except for voluntary demotions or demotions resulting from reduction in force or reduction in compensation, for other than disciplinary reasons, employees with permanent status in the Civil Service may only have their compensation reduced, be demoted, suspended without pay or dismissed for cause.

(1) Cause shall include, but is not limited to, negligence (careless workmanship or slovenliness in the performance of duty); inefficiency or inability to perform assigned duties; insubordination; willful violation of the provisions of law or department rules; conduct unbecoming a public employee which would affect the employee's ability to perform the duties and responsibilities of the employee's job; willful falsification of records (false statements, misrepresentation or fraud of official documents, such as application, attendance and leave records or work and production records); misconduct; drug abuse; conviction of any crime involving moral turpitude; and including, but not limited to, situations where the employee has:

(a) Violated any lawful official regulation or order or failed to obey any proper directive made and given by a superior officer.

(b) Been under the influence of intoxicants while on duty.

(c) Been guilty of insubordination.

(d) Been guilty of disgraceful conduct.

(e) Been offensive in conduct or language in public or towards the public, officials or employees.

(f) Been incompetent or inefficient in the performance of the duties of the position.

(g) Been careless or negligent with the monies or other property of the City.

(h) Failed to pay or make reasonable provisions for future payment of debts to such an extent that such failure is detrimental to the work situation.

(i) Used or threatened to use, or attempted to use, personal or political influence to secure promotion, leave of absence, transfer, change of pay rate or character of work.

(j) Taken for personal use from any person any fee, gift, or other valuable thing in the course of work or in connection with it, when such gift or other valuable thing is given in the hope or expectation of receiving a favor or better treatment than that afforded other persons.

(k) Violated established security procedures during the examination process or has obtained information, through unauthorized or illegal means, which provides an unfair advantage on the examination.

(l) Failed to maintain a satisfactory attendance record. Proper use of sick, vacation, or annual leave shall not constitute grounds for any disciplinary action. Patterns of absences may be considered in determining the proper use of leave.

(m) Failed to acquire or maintain a valid license, registration or certification when such license, registration or certification is required and specified in the class specification for the class to which the position occupied by the employee is classified.

(2) Except in the extraordinary situations described in Rule 9.05(4) below, the department or agency shall furnish the employee with a detailed written statement (in no particular form) supporting the proposed disciplinary

**333.00 PURPOSE**

To ensure that all JFRD employees (including volunteer members) have a work environment that is free from any form of discrimination, harassment, and/or retaliation.

**333.01 SCOPE**

The following laws and regulations are the basis for the provisions of this SAP:

- Title VII of the Civil Rights Act of 1964
- The Equal Pay Act of 1963
- The Age Discrimination in Employment Act of 1967
- Title VI of the Civil Rights Act of 1964
- The Americans with Disabilities Act of 1990
- Florida Civil Rights Act of 1992
- Florida Statute 295
- Florida Statute 760
- Title XI, Chapter 402 of the Jacksonville Municipal Code
- Employee Services Directive 0528

**333.02 POLICY**

The JFRD will not tolerate any behavior, including verbal or physical conduct which constitutes discrimination/harassment. Discrimination/harassment is a prohibited practice within JFRD and any of its organizations, sections, divisions, and affiliations.

The JFRD has a zero tolerance policy and shall fully abide by all applicable federal, state, and local laws. All employees are accountable for compliance with this policy. Violations may lead to disciplinary action as identified in the disciplinary guidelines contained in SAP 304 (Discipline Action) and in the Civil Service and Personnel Rules and Regulations, to include but not limited to, written reprimand, reduction in pay, demotion, or termination. Discipline will be based on the severity of the incident.

333.02.01 GENERAL CONDUCT

JFRD members are expected to perform their duties in an efficient, courteous, and orderly manner. They shall employ patience and good judgment at all times.

Members will be courteous and considerate towards the public and other JFRD personnel. Argumentative, threatening, or disrespectful tones of voice will not be used by any member. Statements that are condescending, snide, rude, or vulgar, will not be tolerated. JFRD personnel will not use harsh, profane, or insolent language or acts in their dealings with others.

JFRD personnel will not use racial, gender, or ethnic slurs. They will use respectful, civil forms of address to all people, regardless of their lifestyle. Displays of bias towards any person based on race, color, sex (including pregnancy), sexual orientation, gender identity or expression, religion, political affiliation, national origin, disability, age, marital status, citizenship, genetic information, veteran status, or any other characteristic is protected by law.

Ostracizing, hazing, or silent treatment of any JFRD personnel will not be tolerated. Such treatment decreases the effectiveness and efficiency of the personnel giving and receiving this type of behavior.

**333.03 DISCRIMINATION/HARASSMENT**

The JFRD will provide equal opportunity to all employees and applicants for employment.

There shall be no discrimination or harassment against any person based on race, color, sex (including pregnancy), sexual orientation, gender identity or expression, religion, political affiliation, national origin, disability, age, marital status, citizenship, genetic information, veteran status, or any other characteristic protected by law in recruitment, hiring, compensation, training, placement, promotion, discipline, demotion, transfer, layoff, recall, termination, working conditions, related terms, or conditions of employment.

333.03.01 DISCRIMINATION

Discriminate, discrimination, and discriminatory include:

- A difference in treatment based on race, color, sex (including pregnancy), sexual orientation, gender identity or expression, religion, political affiliation, national origin, disability, age, marital status, citizenship, genetic information, veteran status, or any other characteristic protected by law, where the difference is not justified by business necessity or is not a *bona fide* occupational qualification.

- Any of the unlawful employment practices hereinafter enumerated.

- An unlawful separation, segregation, or distinction, directly or indirectly against a person based on race, color, sex (including pregnancy), sexual orientation, gender identity or expression, religion, political affiliation, national origin, disability, age, marital status, citizenship, genetic information, veteran status, or any other characteristic protected by law.

- Participating in a contractual or other arrangement or relationship that has the effect of subjecting a covered entity's qualified applicant or employee with a disability to the discrimination prohibited by this SAP (such relationships include an employment agency or referral agency, labor union, an organization providing fringe benefits to an employee of this covered entity, or an organization providing training and apprenticeship programs).

- Excluding or otherwise denying equal jobs or benefits to a qualified individual because of a known disability of an individual with whom the qualified individual is known to have a relationship or association.

333.03.02 HARASSMENT

Under this policy, harassment is verbal, written or physical conduct that denigrates or shows hostility or aversion toward an individual based on race, color, sex (including pregnancy), sexual orientation, gender identity or expression, religion, political affiliation, national origin, disability, age, marital status, citizenship, genetic information, veteran status, or any other characteristic protected by law, or that of his/her relatives, friends or associates, and that: (i) has the purpose or effect of creating an intimidating, hostile or offensive work environment; (ii) has the purpose or effect of unreasonably interfering with an individual's work performance; or (iii) otherwise adversely affects an individual's employment opportunities.

Harassing conduct includes, but is not limited to epithets, slurs, or negative stereotyping; threatening, intimidating or hostile acts; denigrating jokes; and written or graphic material that denigrates or shows hostility or aversion toward an individual or group that is placed on walls or elsewhere on the employer's premises, or circulated in the workplace, on company time or using company equipment by email, phone (including voice messages), text messages, social networking sites, etc.

333.03.03 SEXUAL HARASSMENT

Sexual harassment constitutes discrimination and is illegal under federal, state, and local laws. For the purposes of this policy, sexual harassment is defined as unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when, for example: (i) submission to such conduct is made either explicitly or implicitly as a term or condition of an individual's employment; (ii) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual; or (iii) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance and/or creating an intimidating, hostile, or offensive working environment.

Sexual harassment may include a range of subtle or explicit behaviors and may involve individuals of the same or different gender. Depending on the circumstances, these behaviors may include, but are not limited to: unwanted sexual advances or requests for sexual favors; sexual jokes and innuendo; verbal abuse of a sexual nature; commentary about an individual's body, sexual prowess or sexual deficiencies; leering, whistling, or touching; insulting or obscene comments or gestures; display in the workplace of sexually suggestive objects or pictures; and other physical, verbal or visual conduct of a sexual nature.

**333.04 COMPLAINT PROCEDURE**

All JFRD employees and applicants for JFRD employment may utilize the complaint procedures provided by this section for the resolution of all complaints of discrimination/harassment provided for in Chapter 400 of the Jacksonville Municipal Code; Mayor's Executive Order 2017-01; Employee Services Directive 0528; or by federal, state, or local laws.

The time limit for filing a complaint is within thirty (30) days from the date of the alleged discrimination/harassment or within thirty (30) days from the date an applicant could have reasonably become aware that he/she was discriminated against or harassed.

An individual may contact the Assistant Chief of Equal Employment Opportunity (EEO) at headquarters, Monday through Friday from 0800 to 1700 at (904) 255-3282 or (904) 234-7264. After 1700 or during weekends or holidays, contact FRCC to reach the Duty Division Chief. The Assistant Chief of EEO may also be contacted by email at JFRDEEO@coj.net.

An employee may schedule an on-duty appointment with the Assistant Chief of EEO during normal business hours without loss of time or pay with the following provisions:

- If the employee's complaint is against their immediate supervisor, he/she may inform the next person in the chain of command of the desire to meet with the Assistant Chief of EEO or the City of Jacksonville's Equal Opportunity/Equal Access Division (EO/EA Division).
- While on duty, the employee must inform their supervisor of the need to contact the Assistant Chief of EEO. However, the employee is not required to describe the nature of the appointment.
- The employee's absence at the time of the appointment does not inconvenience the workplace. If so, the employee should reschedule the appointment.
- At management's request, the Assistant Chief of EEO will provide a written statement attesting to the employee's arrival and departure times.

333.04.01 <u>ASSISTANT CHIEF OF EQUAL EMPLOYMENT OPPORTUNITY</u>

There is no set formula for the Assistant Chief of EEO to use during an investigation, but the Assistant Chief of EEO shall:

- Remain impartial in the attempt to resolve any internal complaint.
- Inform the individual of their rights, responsibilities, and options.
- Advise all parties involved in a discrimination/harassment complaint of the requirements preventing retaliation.

- Discontinue the investigation when enough information has been obtained to resolve the problem.

- Arrange a meeting with the individual and appropriate management official(s) to attempt an informal resolution, if appropriate.

- Seek technical assistance from the EO/EA Division, when necessary, when attempting to reach an informal resolution or correct a related problem.

- Upon completion of the investigation, provide a confidential memorandum to the Director/Fire Chief summarizing the investigative findings.

- Recommend suggestive actions for management that are sensible and sound.

- Maintain a record of complaints filed at the Assistant Chief of EEO level for a period of no less than two years. In the event of state or federal charges of discrimination, the department shall maintain all records relevant to the matter, until final disposition. Such records shall be deemed confidential and stored in a secure file separate from personnel records.

- Begin to terminate the inquiry and advise the employee of the right to file his/her complaint at the next level when the Assistant Chief of EEO is reasonably sure that informal resolution cannot be reached within ten (10) days. However, unless the employee requested discontinuance, the Assistant Chief of EEO should continue the inquiry as long as it appears progress is being made in reaching a resolution and to protect the rights of the employee to file a complaint at the next level.

333.04.02 <u>CONFIDENTALITY</u>

JFRD is committed to maintaining confidentiality with the complaint process and encourages employees to come forward to file a complaint if they witness or believe that they have been discriminated/harassed or retaliated against.

All matters regarding the discrimination/harassment complaint and investigation should remain confidential to the highest extent possible, including witnesses.

Statements as well as other documents in the files frequently include information of a personal and sensitive nature. Information obtained from an individual who seeks assistance will not be discussed with other personnel except as necessary to investigate the matter. Documents may be disclosed to witnesses if a valid reason to see all or part of a document exists.

Witnesses are not entitled to know the outcome of a complaint. Should questions arise regarding a disclosure request; the matter will be referred to the EO/EA Division.

## 333.05 FREEDOM FROM RETALIATION

Complainants and their representative(s), witnesses, and all other individuals involved in the processing of a complaint must be free from restraint, interference, coercion, discrimination, or retaliation with respect to their participation in the complaint process. It is unlawful to retaliate against someone because they have opposed any practice that is deemed unlawful, or have made a complaint, charge, testified, assisted, or participated in any manner in an Equal Employment Opportunity proceeding.

## 333.06 OTHER OPTIONS

An individual filing a complaint with the Assistant Chief of EEO and using this internal process does not lose his/her right to seek remedy in accordance with the collective bargaining agreement and/or Civil Service procedures. A complaint initiated with the Assistant Chief of EEO within thirty (30) days is considered filed timely with the EO/EA Division.

If a complaint is beyond the thirty (30) days the individual should be referred to one of the following:

Jacksonville Human Rights Commission (JHRC)
117 W Duval Street, Suite 350
Jacksonville, FL 32202
(904) 255-5397
(Within 180 days from the date of last harm)

Equal Employment Opportunity Commission (EEOC)
Miami Tower
100 Southeast 2nd Street, Suite 1500
Miami, FL 33131
(800) 669-4000
(Within 300 days from the date of last harm)

Florida Commission on Human Relations (FCHR)
4075 Esplanade Way, Suite 110
Tallahassee, FL 32399
(800) 342-8170
(Within 365 days from date of last harm)

I have had 80% more negative experience with the African American community in this country than with white people.

That being said doesn't mean that I haven't had good experiences with African American people.

I have met a lot of great African American people, and I still friends with them, because they good decent people, but that's the 20% of the people I have met that are African Americans.

The other 80% are being nasty, being rude, and being problematic, you know always trying to fight, always disrespecting, so why would I want to be around people like that? No. So I understand where Nick Fuentes is coming from.

Also, about when Nick Fuentes says everyone has a little bit of racism on them, " I agree"

I am Cuban, and sometimes I feel I am racist against my own people because we have our own personality, our own culture that a lot of other people don't like.

I learned how to be an American. So right now, I'm not even similar to my own race. So that's why sometimes I don't like to be around them.

# EXHIBIT B

**BEFORE THE CIVIL SERVICE BOARD**
**IN AND FOR DUVAL COUNTY, FLORIDA**

ROBERT ALVERO,

Employee,

v. Case No.: 2026-056-G

JACKSONVILLE FIRE AND
RESCUE DEPARTMENT,

Employer.
_________________________________/

**ORDER DENYING GRIEVANCE**

This cause came to be heard by the Civil Service Board on September 10, 2026 after due written notice to all parties on Employee, Robert Alvero's Grievance alleging that JFRD violated the civil service rules by issuing a Level 1 Written Reprimand after he posted a public Facebook video containing racially insensitive and disparaging comments. Alvero was represented by Anthony Sabatini, Esq. and Jacksonville Fire and Rescue Department was represented by Sean Granat and Rita Mairs of the Office of General Counsel. The Board, having reviewed the Grievance, the Pre-Hearing Stipulation, and admitted exhibits, and having heard arguments of the parties and sworn testimony of witnesses, and having considered the Civil Service Rules, finds as follows:

1. Alvero is employed by JFRD and subject to the Civil Service and Personnel Rules and Regulations.

2. In or about December 2025, Alvero posted a video on Facebook of himself claiming that 80% of his interactions with African Americans were negative and described African Americans as "nasty," "rude," "problematic," and "always trying to fight." He also endorsed ideas

from an individual widely associated with white nationalism, and although Alvero is Cuban, admitted he is sometimes racist against Cubans and does not like being around them.

3. Several news media outlets reported on the video and linked the video to their stories.

4. Due to the widespread media attention, which included reports that Alvero was not only a member of the Clay County School Board but that he was also a JFRD employee, JFRD's reputation was negatively affected. Because JFRD serves all members of the community, public comments by a firefighter aligning with racist views weaken community trust.

5. Both Chief Golden and Chief Cooke testified that several JFRD employees expressed their upset and concern about Alvero's views as represented on the video. Chief Golden and Chief Cooke further testified that they were personally offended by the video as African American JFRD employees.

6. Chief Golden testified that he determined that Alvero's statements were discriminatory, harmful to workplace cohesion, and damaging to JFRD operations because firefighters work, eat, and sleep in close quarters during 24-hour shifts and must rely on one another in dangerous, high-stress situations. Alvero's remarks undermined morale, strained working relationships, and threatened the unity required for effective emergency response.

7. Taking into account Alvero's otherwise clean disciplinary record and his excellent service at the department, Chief Golden issued the lowest level of discipline—a Level 1 Written Reprimand—finding that Alvero had violated the following policies which warranted the discipline: JFRD Rules and Regulations 100.04.03 (Personal Conduct); JFRD Standard Administrative Procedure 333 (Discrimination/Harassment); City of Jacksonville Employee Services Directive 528 (Anti-Harassment and Discrimination Policy); and Employee Services

Directive 529 (Social Media Policy). Specifically, in making and publishing the video, Alvero made comments disrespecting the public, was hostile towards the public, and attempted to bolster a hostile work environment.

8. Applying Civil Service Rule 9.04(5), disciplinary action was for cause as Alvero violated Civil Service Rule 9.05(1) with conduct unbecoming and by being "offensive in conduct or language in public or towards the public, officials or employees."

9. The City's Social Media Policy (ES Direction 529) expressly states that it must be enforced in compliance with the U.S. Constitution. Accordingly, the Board took into consideration Alvero's First Amendment rights under Pickering v. Board of Ed. of Tp. High School Dist. 205 Will County, Illinois, 391 U.S. 563 (1968) and Connick v. Myers, 461 U.S. 138 (1983).

10. Finding the case of Moore v. City of Roswell, Georgia, 682 F. Supp. 3d 1287 (N.D. Ga. 2023) directly on point, Alvero's speech in the video was not of public concern but was only private speech, as he was not speaking as a public official and he did not call for community action or change. Instead, Alvero admitted that the speech was simply his opinion based on his own personal experience. Accordingly, the speech is not protected under the First Amendment, and the First Amendment analysis is complete.

11. However, assuming arguendo the speech was protected, Moore is also instructive:

> …The Eleventh Circuit has recognized that an organization like a police department has special concerns and "a need to secure discipline, mutual respect, trust and particular efficiency among the ranks due to its status as a quasimilitary entity different from other public employers." Hansen v. Soldenwagner, 19 F.3d 573, 577 (11th Cir. 1994) (citation and quotation omitted); see also Cotriss v. City of Roswell, No. 19-12747, 2022 WL 2345729, at *9 (11th Cir. June 29, 2022) ("Indeed, we have recognized a heightened need for order, loyalty, and harmony in a quasimilitary organization such as a police or fire department.") (quoting Moss v. City of Pembroke Pines, 782 F.3d 613, 621 (11th Cir. 2015)). Thus, Defendants "need not provide proof of actual disruption to their duties and operations; rather, they must show that the speech has the reasonable possibility of causing harm." Id. at *9 (citing Moss, 782 F.3d at 622).

> Even if Moore's speech related to a matter of public concern, which this Court holds it does not, the balancing of interests favors Defendants in this case. With respect to whether the speech at issue impeded the RPD's ability to perform its duties efficiently, there is undisputed evidence that Moore's sharing of the Facebook posts not only had the reasonable possibility of causing harm to the RPD but caused actual disruption. Moore's shared Facebook posts were viewed by a former RPD Communications Officer who shared them with Cooke, a currently employed RPD Communications Officer, whose concern led her to share them with two other RPD Communications Officers, all of whom expressed concern about the posts, relating that they were "offended" and "unsettled." Because Moore was a Senior RPD Communications Officer, "such speech could undermine loyalty, discipline, and good working relationships among the Department's employees if left unattended."

Moore, 682 F. Supp. 3d at 1300. The facts in evidence demonstrate that JFRD, as a quasi-military department, needed to secure discipline, mutual respect, trust and efficiency among the ranks, which included disciplining Alvero for his actions and policy violations. The facts further demonstrate that not only was there a reasonable possibility of causing harm to JFRD but that there was actual disruption evidenced by comments made by members of the department. Accordingly, even if the speech was protected, the written reprimand did not violate Alvero's First Amendment rights because JFRD's interest outweighed any speech interest.

12. Pursuant to Rule 9.03(2)(b)2, a written reprimand may be removed, sealed and retained, if the employee proves by clear and convincing evidence that there was no factual basis for the written reprimand. Alvero did not meet this burden of proof.

13. Accordingly, the Board finds that JFRD did not violate any Civil Service Rule, in particular Civil Service Rule 9.01(2), as Alvero did not prove by clear and convincing evidence that there was no factual basis for the written reprimand. Accordingly, it is hereby

**ORDERED** that the Employee, Robert Alvero's Grievance is **DENIED**.

**DONE AND ORDERED** by the Civil Service Board, at Jacksonville, Duval County, Florida.

______________________________
William J. Miller
Chair, Civil Service Board

____09/16/2026______________
Date signed

Copies to: Anthony Sabatini, Esq.
Sean Granat, Esq.
Rita Mairs, Esq.
Percy Golden II, Director of Fire and Rescue, JFRD
Jake Blanton, Deputy Fire Chief, JFRD
Steven Riska, Division Chief of Operations, JFRD
Kevin Blue, Professional Standards Manager, JFRD
Leah Hayes, Director, Employee Services, ESOD
Todd Norman, Chief, Employee and Labor Relations, ESER
Jennifer Muller, Labor Relations Officer, Labor Relations, ESER
Kelly Dobson, President, International Association of Firefighters (IAFF)
Sean Granat, Deputy General Counsel, OGC
Christopher Garrett, Deputy General Counsel, OGC
Tiffiny Pinkstaff, Chief General Litigation, OGC
Nicole Brantley, Chief Administrative Officer, CSB
Sharon Krebs, Administrative Aide, CSB